UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 11-280 (MJD/JSM)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S TRIAL |
| v. | ) | MEMORANDUM |
| | ) | |
| 12. TODD ALLEN MUDGETT, and | ) | |
| | ) | |
| 16. ERIKA ROMERO MONTENEGRO, | ) | |
| | ) | |
| Defendants. | ) | |

The defendants are charged in a single-count indictment with conspiracy to distribute and possess with the intent to distribute 500 grams or more of a mixture or substance containing methamphetamine and over 100 kilograms of marijuana.  This charge arises from the defendants' participation in a large drug trafficking organization that operated in the St. Paul, Minnesota, area.  From January, 2010 until approximately September, 2011, members of this organization transported large quantities of methamphetamine into Minnesota.  The methamphetamine was then distributed to others, who would sell it to various customers.

1.  **Roles of Conspirators**

Drug trafficking of this scope and scale requires coordinated effort of many different participants, each of whom performed roles essential to the success of the organization.  There were sources of supply, distributers, drivers, couriers, and assistants - each playing a vital role in the conspiracy.  Locally, the investigation focused on the drug trafficking activities of Jose Oceguara, a regional distributer.  Oceguara had a primary source of supply, Uriel Magana-Farias (defendant no. 1) and an alternative source of

supply named Jose Ramirez-Valdovinos (defendant no. 8). Magana-Farias had couriers transport large quantities of methamphetamine from California to Minnesota via passenger automobiles. These automobiles were outfitted with hidden compartments for the purpose of storing controlled substances and large amounts of cash. Once inside Minnesota, the shipment would be offloaded by other members of the conspiracy. Regional distributers, such as Jose Oceguara, received quantities of methamphetamine which could be resold to other distributers. The financial arrangement utilized was typically a "front," an arrangement by which drugs could be supplied to distributers without immediate payment. This allowed distributers to be constantly supplied with methamphetamine. After the methamphetamine was distributed, Oceguara and the other distributers would provide payment. Members of the organization would gather money and ship it back to California via courier.

   2.   **Defendants' Participation**

**Montenegro**

   The government will prove that Erika Montenegro was a courier, that she transported large quantities of methamphetamine from the West Coast into Minnesota in a vehicle that had a hidden compartment. Once in Minnesota, the vehicle would be offloaded and the methamphetamine distributed to others. Montenegro transported large sums of U.S. currency derived from th sale of controlled substances back to the sources of supply from Minnesota. The United States will introduce evidence through the testimony of a cooperating defendant who will indicate that defendant Montenegro

was a courier.  This witness will testify that there would be periods of time when the Minnesota distributers did not have methamphetamine.  The witness will testify that when defendant Montenegro would arrive, the methamphetamine supply was replenished.  This witness also saw Montenegro counting out large sums of cash.

On May 26, 2011, DEA Agent Warren Adamson observed defendant Montenegro meet Javier Hernandez-Coria (defendant no. 5), a distributer for the organization, outside of a Microtel Hotel in Eagan, Minnesota.  The records from the Microtel Hotel show that defendant Montenegro stayed at the hotel on that occasion and others.  Hours after this observation, defendant Montenegro was stopped in Omaha, Nebraska, and her vehicle was searched.  Officers recovered $159,000 U.S. currency in a hidden compartment in the vehicle.  Among this cash, officers found $1,350 that was used to make a controlled purchase of methamphetamine from Javier Hernandez-Coria on May 19, 2011.

Oakland School Officer Antonio Fregoso will testify that in September, 2011 defendant Montenegro provided a post-<u>Miranda</u> statement in which she indicated that she was sent to Minnesota by another individual to pick up money.  Defendant Montenegro stated that the same individual had another female working for him to curry methamphetamine and money.

**<u>Mudgett</u>**

Todd Mudgett was a distributer for the organization who regularly received large quantities of methamphetamine from Jose

Oceguara.   A cooperating co-defendant will testify that Mudgett obtained methamphetamine from Oceguara on several occasions.   One such transaction occurred on August 8, 2011, when Mudgett received approximately one pound of methamphetamine.   The transaction was arranged by Jose Oceguara.   Mudgett received the methamphetamine from one of Oceguara's drivers.   The source of supply for the methamphetamine was Jose Ramirez-Valdovinos, a/k/a Orlando Valencia Nunez.   A little over an hour after this transaction, defendant Mudgett's vehicle was stopped along Highway 36 by the Minnesota State Patrol.   The patrol officer recovered approximately one pound of methamphetamine.   The methamphetamine was wrapped in four individual packages.   Defendant Mudgett's fingerprints are present on two of the four packages.   Defendant Mudgett was arrested and released four days later.   On August 22, 2011, DEA agents intercepted a telephone call between defendant Mudgett and Oceguara arranging yet another methamphetamine transaction.

## Membership in the Conspiracy

The government anticipates that each defendant will claim to not have joined the conspiracy because they were unaware of its full scope and did not agree to all that was necessary to carry out its objectives.   The law is clear in this regard.   First, the government need only prove that defendant reached an agreement or understanding with at least one other person.   Second, the "agreement or understanding" need not be an express or formal agreement or be in writing or cover all the details of how it is to be carried out.   Nor is it necessary that the members have directly

4

stated between themselves the details or purpose of the scheme.  An understanding is legally sufficient.  A person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of one, does not thereby become a member.  But a person may join in an agreement or understanding without knowing all the details of the agreement or understanding, and without knowing who all the other members are.  Further it is not necessary that a person agree to play any particular part in carrying out the agreement or understanding.  A person may become a member of a conspiracy even if that person agrees to play only a minor part in the conspiracy, as long as that person has an understanding of the unlawful nature of the plan and voluntarily and intentionally joins in it.  Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 5.06B.

   3.   **Specific Incidents Involving Conspiracy Members**

   In addition to the evidence of the defendants' direct involvement, the government seeks to introduce evidence of the criminal activities of other members of the conspiracy.  Testimony and exhibits regarding these incidents will be introduced through the case agent.

   While it is true that these acts may not have involved the defendants as direct participants, as the Court well knows, a member of a conspiracy is responsible for the reasonably foreseeable acts of co-conspirators.  If a defendant's participation in a conspiracy has been established, then the defendant is culpable for everything said, written or done by any

of the other conspirators in furtherance of the common purpose of the conspiracy. United States v. Overshon, 494 F.2d 894, 896 (8th Cir. 1974). Each member of a conspiracy may be held criminally liable for any substantive crime committed by a co-conspirator in the course and furtherance of the conspiracy, even though those members did not participate in or agree to the specific criminal act. United States v. Hayes, 391 F.3d 958, 962 (8th Cir. 2004). See Pinkerton v. United States, 328 U.S. 640, 647-48, 66 S. Ct. 1180, 90 L.Ed. 1489 (1946). See also United States v. Navarette-Barron, 192 F.3d 786, 792 (8th Cir. 1999) (explaining that "under Pinkerton, each member of a conspiracy may be held criminally liable for any substantive crime committed by a coconspirator in the course and furtherance of the conspiracy, even though those members did not participate in or agree to the specific criminal act" (citations omitted)).

**A.   Controlled Buys of Methamphetamine From Miguel Sanchez-Rodriguez, a/k/a Gego.**

Special Agent Sean Harris will testify that he directed numerous purchases of methamphetamine from Sanchez-Rodriguez while investigating this organization. These controlled purchases included: March 22, 2011, four ounces of methamphetamine; March 30, 2011, one ounce of methamphetamine; May 11, 2011, two ounces of methamphetamine; and June 1, 2011, four ounces of methamphetamine. Special Agent Harris will testify regarding additional controlled purchases of methamphetamine from Javier Hernandez-Coria, including

April 20, 2011, four ounces of methamphetamine; and May 19, 2011, (mentioned above) four ounces of methamphetamine.

### B.   **Traffic Stop - Brian Bibeau**.

On July 17, 2011, Brian Bibeau (defendant no. 11) was stopped while driving his motorcycle in St. Paul, Minnesota.   Officers recovered approximately one pound of methamphetamine and $14,171 in U.S. currency.   Bibeau had received the methamphetamine from Lopez-Vazquez (defendant no. 4) at the direction of Jose Oceguara, who had been given the methamphetamine by Sanchez-Rodriguez.

### 4.   **Wiretap Conversations**.

The United States intends to introduce recordings of conversations between defendant Mudgett and Jose Oceguara that were seized pursuant to an authorized wiretap.   These conversations occurred in the Spanish language.   The United States will also introduce an English transcript of an intercepted communication in Spanish between Susana Barragan-Sanchez (defendant no. 6) and an individual identified as "Pete."   During this conversation, Susana and Pete discussed various individuals involved in the drug trafficking organization.   Susana Barragan-Sanchez makes reference to "Erika" and describes how "they" gave her a "big scare."   Susana Barragan-Sanchez continues to indicate that "they took $168" and indicates that Erika talked about visiting Susana Barragan-Sanchez's sister, Adelaida Barragan-Sanchez (defendant no. 7).   The government believes this is a reference to Erika Montenegro's being pulled over by law enforcement officers in Nebraska and the large cash seizure.   Susana Barragan-Sanchez was

telling "Pete" that Erika had a "big mouth," expressing irritation that Montenegro had mentioned Adelaida Barragan-Sanchez' name. Susana Barran-Sanchez added, "I am telling you this, so that you won't go visit her."

This statement is admissible as an admission by a party opponent in that it was a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). The United States does not intend to play the Spanish language recording, but rather publish the English translation transcript to the jury. There are also some relatively short Spanish-language recorded conversations between Oceguara, a supplier, and his driver relevant to the Mudgett traffic stop. The United States intends play the Spanish-language recordings and publish the English translation transcripts to the jury. <u>See United States v. Gutierrez</u>,367 F.3d 733 (8th Cir. 2004). The United States is requesting 8th Circuit Model Instruction §2.06A be read to the jury.

5. <u>**Logistics**</u>.

Several of the United States witnesses are from out-of-town and some of the cooperating co-defendants are in custody. It may be necessary for the government to seek permission of the Court to take witnesses out of order and provisionally receive exhibits on conditional relevant grounds to account for anticipated travel and transport-related issues. None of the government witnesses require interpreters.

**6.   <u>Evidence of Marijuana Trafficking</u>**.

This conspiracy also manufactured, transported, and sold marijuana.  The United Sates does not intend to offer any evidence regarding the marijuana aspect of this conspiracy.  Accordingly, the government has prepared a redacted indictment and requests that no return be made to marijuana.


Dated: March 9, 2012                    Respectfully submitted,

                                        B. TODD JONES
                                        United States Attorney

                                        *s/Steven L. Schleicher*

                                        BY: STEVEN L. SCHLEICHER
                                        Assistant U.S. Attorney
                                        Attorney ID No. 260587